ELECTRONICALLY FILED
Jefferson County Circuit Court
Flora Cook-Bishop, Circuit Clerk
2026-Jun-25 15:22:28
35CV-26-975
C11WD02 : 14 Pages

**IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ARKANSAS**
**CIVIL DIVISION**

**CHRISTOPHER DOOLITTLE** **PLAINTIFF**

**v.** **Case No. __________**

**THE CITY OF PINE BLUFF** **DEFENDANT**

**COMPLAINT**

Comes now Plaintiff Christopher Doolittle, by and through undersigned counsel, and states:

PARTIES, JURISDICTION, AND VENUE

1. Mr. Christopher Doolittle is a resident of Pine Bluff, Arkansas.

2. The City of Pine Bluff ("Pine Bluff" or "city") is a municipality in the state of Arkansas.

3. The acts complained of occurred within Jefferson County, Arkansas, rendering venue proper.

4. Jurisdiction is proper.

FACTS

5. Christopher Doolittle was hired as a fireman for the city on or about September 6, 2016.

6. He received a promotion to Engineer in 2021.

7. His duties as Engineer include driving himself and colleagues to emergencies in a fire engine.

8. On October 18, 2025, a call came in regarding an emergency at a commercial complex located near the intersection of Camden Road and 28th Street in Pine Bluff.

9. Engine 5 Company, consisting of Mr. Doolittle and two other firefighters, Engineer (and Acting Officer) James Maurer and Firefighter Joshua Tomboli, responded from Station 1 to address the issue.



DEFENDANT'S EXHIBIT A
tabbies

10. As engineer, Mr. Doolittle operated the truck.

11. While driving the truck, Mr. Doolittle had the lights and sirens activated.

12. While making its way down 28th Street, the engine came across the intersection with Catalpa.

13. There was a stoplight at this intersection.

14. Catalpa intersected with 28th Street.

15. A car was coming down Catalpa as the engine approached.

16. This initially braked as the engine approached the intersection.

17. However, before the engine cleared the intersection, the car began to accelerate again.

18. This maneuver placed the civilian vehicle in the path of the engine.

19. The two vehicles collided.

20. The Department thereafter looked into the occurrence.

21. This investigation included interviews with the Company conducted by Assistant Chief Ernest Jones.

22. The civilian driver was not interviewed.

23. No accident reconstruction expert was consulted.

24. No third party expert was consulted.

25. No third party eyewitnesses were interviewed.

26. No third party eyewitnesses were sought.

27. No third party eyewitnesses were contacted.

28. No interviewee expressed a belief that Mr. Doolittle's actions caused the accident.

29. No interviewee expressed a belief that Mr. Doolittle had breached any standard of care that day.

30. No interviewee expressed a belief that Mr. Doolittle had driven imprudently that day.

31. No interviewee expressed a belief that Mr. Doolittle had driven unwisely that day.

32. No interviewee expressed a belief that Mr. Doolittle had driven dangerously that day.

33. Mr. Doolittle's expressed belief was that the accident was the civilian driver's fault.

34. Mr. Tomboli's expressed belief was that the accident was the civilian driver's fault.

35. Mr. Maurer's expressed belief was that the accident was the civilian driver's fault.

36. On October 22, 2025, Jones issued an Incident Report ("Report").

37. Assistant Chief Jones determined that Doolittle had been driving at a rate of speed that exceeded the posted speed limit.

38. He concluded that Mr. Doolittle had failed "to drive with due regard for the safety of all persons" and exhibited "reckless disregard for the safety of others."

39. Based largely on Maurer's guesstimate that the truck was traveling 40-45 miles per hour and Jones' own determination that the mere fact that an accident occurred demonstrated that Doolittle had been driving faster than the posted speed limit of 35 miles per hour, Jones then determined that Doolittle had been driving at an excessive speed.

40. It identified this as one of three Policy/Procedure violations that would justify discipline, up to and including termination.

41. The others cited were Policy 102.01, with the Incident Report notating, "Damage to Fire Department property resulting from negligent action or from failure to properly care for it," and Ark. Code Ann. § 27-37-702, requiring the use of seat belts.

42. These findings are deeply at odds with what Doolittle, Maurer, and Tomboli had to say about the incident.

43. For instance, the Report mentions that Doolittle was driving above the speed limit.

44. However, it completely omits that this is typical practice when responding to an emergency.

45. The Report also omits that neither of Doolittle's colleagues believed him to be travelling at a speed that was excessive under the circumstances.

46. Crucially, it completely omitted the detail, shared by both Doolittle and Maurer, that the other driver had indicated her submission to the engine's right of way by stopping at her light before, puzzlingly, trying to blow right through through the intersection.

47. This driver's actions are what made a collision inevitable.

48. The Report also did not recognize Doolittle's efforts, which were noted and lauded by his Company mates, to swerve and strike the other driver's car in a "safer" point of her vehicle.

49. One of Mr. Doolittle's colleagues opined that this action likely resulted in the other driver being less seriously harmed than she would have been otherwise.

50. This analysis also notes the lack of braking.

51. However, it did not mention that the other occupants of the engine agreed that Mr. Doolittle did slow the vehicle.

52. Indeed, as written, the Report seems to suggest that Doolittle simply drove right through the intersection with zero regard for civilians, and ignores every fact in his favor.

53. Interim Fire Chief Randy Compton followed up this Report in a November 7, 2025, letter identified as a Notice of Intent to Terminate Employment ("Notice" or "Letter").

54. Mr. Doolittle received this Notice the day he returned from a medical leave to seek diagnosis and treatment of an injury sustained and/or exacerbated by the accident.

55. The Notice notified Doolittle that he intended to terminate him, and accused him of violating several policies, rules, and traffic laws.

56. Without meaningful explanation, it stated that he had committed a violation of department policy.

57. It asserted that he had failed to demonstrate an ability to safely maneuver and control the apparatus.

58. It cited to Ark. Code Ann. § 27-51-901 “et seq.” due to an alleged failure to “exercise ‘due regard for the safety of all persons.’”

59. It also referenced Ark. Code Ann. § 21-9-301, the municipal tort immunity statute.

60. Notably, it wrongfully and without factual or legal justification asserted that the circumstances of the collision would abrograte the City’s immunity as a demonstration of gross negligence or malicious conduct.

61. Gross negligence has not been recognized as a basis to abrogate statutory immunity.

62. Indeed, an attempt to hold that gross negligence overcomes statutory municipal immunity was rejected in a recent Arkansas Court of Appeals case *in which the City itself was the appellee*. *See Sledge v. City of Pine Bluff*, 2022 Ark. App. 23.

63. The City educates its department leadership regarding legal issues pertinent to their work.

64. Interim Chief Compton has received training, education, and/or information from the City or an agent or agents thereof on legal principles.

65. Interim Chief Compton has received training, education, and/or information from the City or an agent or agents thereof on municipal liability.

66. Interim Chief Compton has received training, education, and/or information from the City or an agent or agents thereof on statutory immunity.

67. Interim Chief Compton had no basis to believe that the collision was the result of Mr. Doolittle’s intentionally crashing into the civilian driver.

68. Interim Chief Compton did not believe that the collision was the result of Mr. Doolittle's intentionally crashing into the civilian driver.

69. Interim Chief Compton did not believe that the collision was the result of Mr. Doolittle's maliciously crashing into the civilian driver.

70. Interim Chief Compton did not believe that the collision was the result of Mr. Doolittle's gross negligence.

71. The civilian driver has made no claim against the City.

72. If the civilian driver *has* made a claim against the City, the City has not conceded liability.

73. The City has never taken the position that proof of gross negligence by a City employee operating a vehicle in the course and scope of his employment entitles a personal injury plaintiff to relief against it for any amount greater than its liability insurance coverage.

74. The City has not taken the position that proof of gross negligence by a City employee operating a vehicle in the course and scope of his employment entitles a personal injury plaintiff to relief against it for any amount greater than its liability insurance coverage at any point within the last twenty (20) years.

75. The City has not paid any claims from this incident on the basis that Mr. Doolittle engaged in gross negligence or malicious conduct.

76. The department's analysis ignored both numerous statutes setting forth the rights and responsibilities of one driving a fire truck to an emergency.

77. The department's analysis ignored both numerous statutes setting forth the responsibilities of civilian drivers in the vicinity of a fire truck responding to an emergency.

78. The department's analysis made no attempt to consider the acts and omissions of the other driver involved in the collision.

79. Neither the Report nor Notice mention the civilian driver by name.

80. Neither the Report nor Notice discuss the civilian driver's actions except to note that she was struck by the fire engine.

81. That civil driver was negligent.

82. That driver's negligence is what caused the collision.

83. Mr. Doolittle did not operate the engine in a negligent manner while responding to the October 18 call.

84. The Letter noted that Mr. Doolittle could appeal within ten days and that failure to do so would result in the termination going into effect on November 18.

85. Mr. Doolittle timely sought review.

86. A review panel convened on December 9, 2025, by the City ruled in its favor.

87. The substantive portion of the document generated by the panel simply had a box checked next to the text, "The disciplinary action is imposed as originally imposed."

88. Complex legal issues impact whether someone acted negligently.

89. Generally, lawyers are more skilled at questioning witnesses than non-lawyers.

90. Generally, lawyers are more skilled at explaining the law than non-lawyers.

91. Generally, lawyers are better informed about the law than non-lawyers.

92. Generally, lawyers are better at preparing for a hearing rooted in issues of law and fact.

93. The only witnesses at the hearing were Doolittle and Compton.

94. An attorney very likely would have called other witnesses.

95. There were a number of deficiencies in the City's argument.

96. However, it is more difficult for someone without legal expertise to adequately expose legally deficient positions than someone with such training.

97. A lawyer would likely have been a more effective advocate than Mr. Doolittle was for himself.

98. However, pursuant to Pine Bluff's law governing city employee discipline, Mr. Doolittle was not allowed to have counsel represent him at the review hearing.

99. He was unable to adequately answer the charges against him, which was that he acted negligently.

100. The only eyewitness evidence presented was the testimony of Mr. Doolittle himself.

101. His testimony did not establish that he acted negligently.

102. Aside from examination of Mr. Doolittle, the City's presentation was solely hearsay.

103. A police report from an officer who was neither at the accident nor cited the testimony of any witness was presented.

104. The report of Deputy Chief Jones, who was also not present at the accident and largely excluded the information provided by the witnesses, was presented.

105. Interim Chief Compton largely discussed property damage, with little to no competent proof of actual negligence presented.

106. No action to formally sever the employment relationship was ever taken.

107. To this day, Mr. Doolittle has never received any document definitively stating that he has been terminated.

108. Mr. Doolittle is a salaried employee but has not been paid since November 2025.

109. Per City law and policy, Pine Bluff firefighters may only be terminated or otherwise seriously disciplined for good cause.

110. The basis of the City's action is that Mr. Doolittle acted negligently the day of the accident.

111. The sole stated basis of the discipline leveled against him is that he acted negligently.

112. How the other driver in an accident acted is relevant to whether negligence occurred.

113. Road conditions, traffic, and the circumstances of the trip are also relevant factors in ascertaining whether negligence occurred.

114. The City's presentation at the review hearing did not include any analysis of the other driver's actions.

115. The City's presentation at the review hearing did not include any expert testimony.

116. The City's presentation at the review hearing did not include any eyewitness testimony.

117. The City's presentation at the review hearing included issues that were not raised previously and for which Mr. Doolittle did not receive notice before the hearing.

118. The review panel was composed of an Assistant City Attorney and two City department heads.

119. The City Attorney is the legal representative of the City of Pine Bluff, charged with serving as the City's legal advisor, counselor, and prosecutor.

120. The City Attorney's office advises City actors on a host of legal matters.

121. Among the matters upon which the City Attorney advises is employee discipline.

122. Moreover, the City Attorney's office wishes to see the City avoid liability exposure.

123. This interest is potentially at odds with serving as a neutral arbiter in a hearing to determine whether a disciplinary decision was valid.

124. It is reasonably likely that the City Attorney's office discussed the potential discipline of Mr. Doolittle with an agent of the Pine Bluff Fire Department.

125. On information and belief, an attorney from the City Attorney's office discussed this case with fire department leadership before the review hearing.

126. This exposure to the department leadership's position and version of events and desire to validate their approach taints the participation of an attorney from that office in a review hearing.

127. Moreover, the other members of the panel were City department heads.

128. The City's standard practice is to have review hearings chaired by a lawyer from the City Attorney's office and the committed filled out with two other Department heads.

129. The chief of the Pine Bluff Fire Department is a City department head.

130. City department heads have a clear interest in protecting the City from liability.

131. City employees have a clear interest in protecting the City from liability.

132. The review committee members are paid by the City of Pine Bluff.

133. They rely on the City for their income.

134. Based on the manner in which the review committee is constructed, it is reasonably likely that those judging a fellow department head's personnel decisions may have that same department head judging *their* decisions at some point.

135. Among the duties of City department heads is making disciplinary decisions.

136. City department heads are more likely to identify with other department heads over a rank and file employee.

137. The conditions discussed above combine to render the review process biased and not impartial.

138. The panel reached its decision in roughly an hour.

139. The accident was not the result of negligence by Mr. Doolittle.

140. Mr. Doolittle is not aware of no non-black firefighter, any firefighter under 40, and any firefighter not recovering from injury who has been suspended or terminated for having a traffic accident.

141. He was given the Notice the very day he returned from a medical leave.

142. He does not have a poor performance record.

143. He does not have a poor disciplinary record.

144. He timely filed an administrative charge with the EEOC.

145. He received his Right to Sue letter on or about June 9, 2026.

## CAUSES OF ACTION

### Count One – Wrongful Discipline (Termination or Suspension)

146. Mr. Doolittle hereby incorporates the previous allegations of fact made herein.

147. As a Pine Bluff firefighter, Mr. Doolittle was subject to discipline only for good cause.

148. He has been excluded from work since November 2025 without good cause.

149. In the alternative, if he is determined to have been terminated, this termination occurred without good cause.

### Count Two – Race Discrimination

*Arkansas Civil Rights Act & Civil Rights Act of 1964*

150. Plaintiff Doolittle incorporates, as if fully repeated herein, all previous allegations of fact.

151. Mr. Doolittle is a racial minority.

152. He was meeting the employer's legitimate job expectations.

153. He suffered an adverse employment action.

154. There are facts that permit an inference of discrimination.

### Count Three – Disability Discrimination

*Arkansas Civil Rights Act & Americans with Disabilities Act*

155. Plaintiff Doolittle incorporates, as if fully repeated herein, all previous allegations of fact.

156. Mr. Doolittle received an injury on the job and took leave to recuperate.

157. Following his injury, he was disabled, regarded as disabled, and/or had a record of disability.

158. He was meeting the employer's legitimate job expectations and able to fulfill his job duties, with or without reasonable accommodation.

159. He suffered an adverse employment action.

160. There are facts that permit an inference of discrimination.

**Count Four – Disability Retaliation**

*Arkansas Civil Rights Act & Americans with Disabilities Act*

161. Plaintiff Doolittle incorporates, as if fully repeated herein, all previous allegations of fact.

162. Mr. Doolittle engaged in protected activity.

163. He was meeting the employer's legitimate job expectations and able to fulfill his job duties, with or without reasonable accommodation.

164. He suffered an adverse employment action.

165. There are facts that permit an inference of discrimination.

**Count Five – Due Process Violations**

*42 U.S.C. § 1983 & Arkansas Civil Rights Act*

166. Plaintiff Doolittle incorporates, as if fully repeated herein, all previous allegations of fact.

167. The City's disciplinary process generally does not, and did not in this instance, provide for adequate, appropriate due process.

168. Under the circumstances, in which the basis of discipline was a complicated legal issue, the process granted was constitutionally inadequate.

169. Potential bias, actual bias, failure to adequately consider and weigh the evidence, and other deficiencies were present throughout this process.

170. The evidence presented by the City at the review hearing was unreliable hearsay and insufficient.

171. Mr. Doolittle was not allowed to challenge his discipline before it was imposed.

172. Mr. Doolittle did not receive notice of all the bases of proposed discipline.

173. These facts, along with others, establish a violation of Mr. Doolittle's right to due process.

174. He has been damaged by these violations.

**Count Six – Breach of Contract**

175. Plaintiff Doolittle incorporates, as if fully repeated herein, all previous allegations of fact.

176. Mr. Doolittle has not received pay or benefits since October 2025 despite never actually having been terminated.

177. The City has breached his employment contract by not fulfilling those obligations.

**Count Seven – Age Discrimination**

*Age Discrimination in Employment Act & Ark. Code Ann. § 21-3-203*

178. Plaintiff Doolittle incorporates, as if fully repeated herein, all previous allegations of fact.

179. Mr. Doolittle is over the age of 40.

180. He suffered an adverse employment action.

181. There are facts that permit an inference of discrimination.

**Count Eight – Declaratory Judgment**

182. Plaintiff Doolittle incorporates, as if fully repeated herein, all previous allegations of fact.

183. Pine Bluff, Ark., Mun. Code § 19-137(i)(1) expressly bars all employees challenging a disciplinary decision from having counsel represent them.

184. Due process requirements mandate, or at least, under certain circumstances, *can* mandate, the opportunity for an employee challenging discipline to be represented by an attorney.

185. Both facially and as applied to Mr. Doolittle, the ordinance is unconstitutional.

DAMAGES & CONCLUSION

186. As a result of the foregoing, Mr. Doolittle suffered, without limitation, lost income, negative effects to his mental and physical health, loss of work opportunity, stress, emotional anguish, and other harms.

187. He is entitled to the following as relief:

a. Injunctive relief;
b. Compensatory damages;
c. Punitive damages;
d. Fees, including an attorney's fee, and costs;
e. All other legal and equitable relief to which the Court deems him entitled.

188. He requests a trial by jury.

Respectfully submitted,

/s/Geoffrey D. Kearney
Geoffrey D. Kearney
Ark. Bar No. 2012304

The Law Office of Geoffrey D.
Kearney, PLLC
P.O. Box 8276
Pine Bluff, AR 71611
P: 870-376-3068
E: GDK@gdkpllc.com

Attorney for Plaintiff